1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   JAN THOMSEN,                      CIV. NO. 1:15-01506 WBS SAB

13             Plaintiff,              MEMORANDUM AND ORDER RE: MOTION
                                       FOR SUMMARY JUDGMENT
14        v.

15   GEORGIA-PACIFIC CORRUGATED,
     LLC,
16

17             Defendant.

18

19                          ----oo0oo----

20        Plaintiff Jan Thomsen brought this employment

21   disability discrimination action after his previous employer,

22   defendant Georgia-Pacific Corrugated, LLC, terminated his

23   employment.  Pursuant to Federal Rule of Civil Procedure 56,

24   defendant now moves for summary judgment on all of plaintiff's

25   claims.

26   I.   Brief Factual and Procedural Background

27        Plaintiff began working for defendant in approximately

28   1991 at its corrugated container plant in Madera, California.

                                1

1    After injuring his shoulder while at work in May 2012, plaintiff

2    went on workers' compensation leave and returned to work in

3    January 2013 after undergoing surgery on his left shoulder.

4    (Thomsen Dep. at 24:12-19, 55:13-22.)  At the time he went on

5    leave, plaintiff had been working as a cut and die operator.

6    (Id. at 21:8-11.)  Defendant initially accommodated his

7    disability by assigning him to a temporary position and then

8    transferring him to a new position as an assistant end gluer.

9    After working as an assistant end gluer, plaintiff claims he

10   needed additional modifications to that position to accommodate

11   his disability.

12         On February 19, 2014, defendant contends plaintiff was

13   required to work overtime, but refused to do so and left the

14   plant in violation of defendant's policies.  After performing an

15   investigation, defendant terminated plaintiff's employment on

16   March 3, 2014 allegedly because of that conduct.

17         Alleging that defendant failed to engage in the

18   interactive process and accommodate his disability and that

19   defendant terminated him because of his disability, plaintiff

20   initiated this action in state court.  In his Complaint,

21   plaintiff alleges the following claims: (1) disability

22   discrimination in violation of subsection 12940(a) of

23   California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't

24   Code §§ 12940-12951; (2) failure to provide reasonable

25   accommodation in violation of subsection 12940(m) of FEHA; (3)

26   failure to engage in the interactive process in violation of

27   subsection 12940(n) of FEHA; (4) wrongful termination in

28   violation of public policy; and (5) defamation.  (Docket No. 1-

2

1.)  After removing the action to this court on the basis of
diversity of citizenship, defendant now moves for summary
judgment on all of plaintiff's claims.[1]  (Docket No. 19-1.)

II.  <u>Analysis</u>

        Summary judgment is proper "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A material fact is one that could affect the outcome
of the suit, and a genuine issue is one that could permit a
reasonable jury to enter a verdict in the non-moving party's
favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).  The party moving for summary judgment bears the initial
burden of establishing the absence of a genuine issue of material
fact and can satisfy this burden by presenting evidence that
negates an essential element of the non-moving party's case.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
Alternatively, the moving party can demonstrate that the non-
moving party cannot produce evidence to support an essential
element upon which it will bear the burden of proof at trial.
<u>Id.</u>

        Once the moving party meets its initial burden, the

_____

[1]    Plaintiff filed eight objections to evidence defendant
submitted.  (Docket No. 21-2.)   Notwithstanding the questionable
grounds for most of plaintiff's objections, the court denies them
as moot because it does not rely on any of that evidence in
granting summary judgment in favor of defendant.
        Defendant also takes issue with plaintiff's 470
additional statements of undisputed fact and cursory analysis of
those facts in his brief.  The court will not avoid the merits of
plaintiff's claims because of the poor way in which counsel
opposed the motion and therefore denies defendant's motion to
strike.

1   burden shifts to the non-moving party to "designate 'specific

2   facts showing that there is a genuine issue for trial.'"  Id. at

3   324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

4   the non-moving party must "do more than simply show that there is

5   some metaphysical doubt as to the material facts."  Matsushita

6   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

7   "The mere existence of a scintilla of evidence . . . will be

8   insufficient; there must be evidence on which the jury could

9   reasonably find for the [non-moving party]."  Anderson, 477 U.S.

10   at 252.

11        In deciding a summary judgment motion, the court must

12   view the evidence in the light most favorable to the non-moving

13   party and draw all justifiable inferences in its favor.  Id. at

14   255.  "Credibility determinations, the weighing of the evidence,

15   and the drawing of legitimate inferences from the facts are jury

16   functions, not those of a judge . . . ruling on a motion for

17   summary judgment . . . ."  Id.

18        A.   FEHA Reasonable Accommodation & Interactive Process

19             1.   Subsection 12940(m): Reasonable Accommodation

20        Under subsection 12940(m) of FEHA, it is unlawful for

21   an employer "to fail to make reasonable accommodation for the

22   known physical or mental disability of an applicant or employee"

23   unless the accommodation would "produce undue hardship."  Cal.

24   Gov't Code § 12940(m); see also Cal. Gov't Code § 12926(u)

25   (defining "undue hardship").  "The elements of a reasonable

26   accommodation cause of action are (1) the employee suffered a

27   disability, (2) the employee could perform the essential

28   functions of the job with reasonable accommodation, and (3) the

4

1    employer failed to reasonably accommodate the employee's

2    disability." <u>Nealy v. City of Santa Monica</u>, 234 Cal. App. 4th

3    359, 373 (2d Dist. 2015).   Defendant moves for summary judgment

4    based solely on the third element, arguing that it reasonably

5    accommodated plaintiff as a matter of law.

6            "A reasonable accommodation is a modification or

7    adjustment to the work environment that enables the employee to

8    perform the essential functions of the job he or she holds or

9    desires." <u>Id.</u> at 373; <u>see</u> <u>id.</u> at 374-75 ("Reasonable

10   accommodations may include, among other things, job restructuring

11   or permitting an alteration of when and/or how an essential

12   function is performed," but "elimination of an essential function

13   is not a reasonable accommodation.").   "Reasonable accommodation

14   may also include 'reassignment to a vacant position' if the

15   employee cannot perform the essential functions of his or her

16   position even with accommodation." <u>Id.</u> at 377 (quoting Cal.

17   Gov't Code § 12926(p)(2)).   "FEHA requires the employer to offer

18   the employee 'comparable' or 'lower graded' vacant positions for

19   which he or she is qualified," but "does not require the employer

20   to promote the employee or create a new position for the employee

21   to a greater extent than it would create a new position for any

22   employee, regardless of disability." <u>Id.</u> (quoting Cal. Code

23   Regs., tit. 2, § 11068(d)(1), (2)).

24           2.   <u>Subsection 12940(n): Interactive Process</u>

25           Under subsection 12940(n), it is unlawful for an

26   employer "to fail to engage in a timely, good faith, interactive

27   process with the employee or applicant to determine effective

28   reasonable accommodations, if any, in response to a request for

1  reasonable accommodation by an employee or applicant with a known

2  physical or mental disability or known medical condition."  Cal.

3  Gov't Code § 12940(n).  "The employee must initiate the process

4  unless the disability and resulting limitations are obvious," and

5  the employee must "'specifically identify the disability and

6  resulting limitations, and [] suggest the reasonable

7  accommodations.'"  Scotch v. Art Inst. of Cal.-Orange Cnty.,

8  Inc., 173 Cal. App. 4th 986, 1013 (4th Dist. 2009) (quoting

9  Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 165 (5th Cir.

10 1996)).  "FEHA requires an informal process with the employee to

11 attempt to identify reasonable accommodations, not necessarily

12 ritualized discussions."  Nealy, 234 Cal. App. 4th at 379.

13        "Both employer and employee have the obligation 'to

14 keep communications open' and neither has 'a right to obstruct

15 the process.'"  Scotch, 173 Cal. App. 4th at 1014 (quoting Jensen

16 v. Wells Fargo Bank, 85 Cal. App. 4th 245, 266 (2d Dist. 2000)).

17 "Each party must participate in good faith, undertake reasonable

18 efforts to communicate its concerns, and make available to the

19 other information which is available, or more accessible, to one

20 party."  Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 62

21 n.22 (2d Dist. 2006).  "Liability hinges on the objective

22 circumstances surrounding the parties' breakdown in

23 communication, and responsibility for the breakdown lies with the

24 party who fails to participate in good faith."  Id.

25        3.   Analysis of the Subsections 12940(m) and (n)

26             Claims

27        When plaintiff returned to work with restrictions in

28 January 2013, it is undisputed that defendant initially

6

accommodated his disability by assigning him to work on a long-term temporary project of supervising other temporary employees who were sorting damaged containers.  (Thomsen Dep. at 25:8-27:14, 31:5-17; Pangborn Decl. at 156 (Docket No. 19-2).)  As of October 2013, plaintiff's physician indicated that plaintiff had "permanent restrictions" and could not carry anything over thirty pounds.  (Pangborn Decl. at 156.)  Upon completion of the temporary project, it is undisputed that plaintiff was still unable to return to his prior position.

At that time, defendant's Plant Superintendent, Jose Garcia; General Manager, Anthony Garcia; Human Resources Generalist, Shanna Naeole; and Plant Manager, Joe Del Razo met to discuss potential accommodations for plaintiff.  (Naeole Dep. at 38:4-8.)  They considered all positions for which plaintiff was qualified and that would accommodate his lifting restriction. (J. Garcia Dep. at 76:6-8; A. Garcia Dep. at 56:11-57:24.) Defendant determined that the potential positions for plaintiff included a forklift driver and an assistant end gluer.  (J. Garcia Dep. at 76:6-8.)

Anthony and Jose Garcia and Del Razo then met with plaintiff to discuss the potential new positions.  (A. Garcia Dep. at 57:10-21; Thomsen Dep. at 40:11-23.)  At that time, there was not an opening for a forklift driver, (A. Garcia Dep. at 57:15-25), and plaintiff does not contend that he should have been offered that position.  There was an opening for an assistant end gluer, and defendant offered that position to plaintiff as a lateral transfer with the same pay.  (Thomsen Dep. at 54:4-8.)  Plaintiff indicated at that meeting that he could

1  fulfill the responsibilities of the position and accepted the

2  transfer.  (A. Garcia Dep. at 57:15-21; Thomsen Dep. at 48:11-

3  50:1.)

4       Despite fulfilling their obligations under FEHA as of

5  that meeting and transfer, plaintiff contends defendant

6  nonetheless violated FEHA when (1) defendant did not subsequently

7  offer plaintiff a quality lab technician ("QL Technician")

8  position instead of the assistant end gluer position; and (2)

9  failed to subsequently modify the assistant end gluer position.

10                    a.   QL Technician Position

11       At some point after offering plaintiff the assistant

12  end gluer position, plaintiff claims he informed defendant that

13  he was interested in an opening for a QL Technician.  (Thomsen

14  Dep. at 41:7-24.)  Jose and Anthony Garcia testified that the QL

15  Technician position would not have been consistent with

16  plaintiff's lifting restriction because it could require lifting

17  in excess of thirty pounds when visiting various customers.  (A.

18  Garcia Dep. at 58:11-59:2; J. Garcia Dep. at 48:15-18.)

19  Plaintiff also testified that he was told that the QL Technician

20  position was not possible for him because it occasionally

21  requires lifting over forty pounds.  (Thomsen Dep. at 106:13-20.)

22  Anthony Garcia testified that the lifting requirement of a QL

23  Technician could not have been accommodated because the lifting

24  occurs at customers' facilities and thus the ability to use any

25  lifting device would have been dependent on what each customer

26  had available.  (A. Garcia Dep. at 58:24-59:8.)

27       Even assuming that lifting in excess of thirty pounds

28  was not an essential function of the QL Technician position and

                                    8

1   that plaintiff was qualified for that position,[2] "FEHA does not

2   obligate an employer to choose the best accommodation or the

3   specific accommodation a disabled employee or applicant seeks."

4   Raine v. City of Burbank, 135 Cal. App. 4th 1215, 1222 (2d Dist.

5   2006).  It is undisputed that plaintiff initially agreed that the

6   assistant end gluer position accommodated his disability and FEHA

7   did not obligate defendant to offer plaintiff the position he

8   found more preferable.

9        It is therefore undisputed that at the time defendant

10  had transferred plaintiff to the assistant end gluer position, it

11  had adhered to its obligation to engage in the interactive

12  process and accommodate plaintiff's disability.

13            b.    Modifications to Assistant End Gluer Position

14        After working as an assistant end gluer, plaintiff

15  testified that he discovered the duties were not consistent with

16  his lifting restriction and that he needed modifications.  About

17

---

18       [2]   Genuine disputes exist as to whether plaintiff was in
    fact qualified for the QL Technician position.  While it is
19  undisputed plaintiff did not possess the necessary computer
    skills for the position, (J. Garcia Dep. at 48:2-49:2; Thomsen
20  Dep. at 21:21-22:12), a reasonable jury could find that plaintiff
    could have taught himself those skills, (see J. Garcia Dep. at
21  49:13-24 (testifying that he had successfully taught himself the
    necessary computer skills when he had previously worked as a QL
22  Technician and that he did not see any reason why plaintiff could
    not have also taught himself those skills)).
23       Defendant also contends that plaintiff lacked the
    necessary customer service experience and skills for that
24  position.  In the more than twenty years plaintiff worked for
    defendant, he had worked exclusively in production roles that
25  primarily required physical labor and never gained customer
    service experience.  (Thomsen Dep. at 21:21-22:12.)  At the same
26  time, there is some evidence that defendant offered public
    speaking training for its employees and plaintiff could have been
27  eligible for that training.  (See J. Garcia Dep. 20:22-21:18.)

28

two weeks to one month after working as an assistant end gluer,
plaintiff raised concerns about the position with Kristina Lloyd
in Human Resources.  (Thomsen Dep. at 55:3-13.)  He contends he
told Lloyd that the occasional need to lift more than thirty
pounds, the long hours, and the manual operation of the overhead
lever were causing him shoulder pain.  (Id. at 16:4-13, 49:1-7,
50:11-51:13, 55:15-23; see also Lloyd Dep. at 102:21-103:11
(testifying that she recalls plaintiff complaining about shoulder
pain when he had to work overtime, but that she does not recall
him complaining about the overhead lever).)  Plaintiff also
contends that "Mr. Garcia . . . was standing in the door" when he
was talking with Lloyd and that he told Garcia that "it would
have been nice for him to send a message out to all supervisors
to let them know of [his] restrictions."  (Thomsen Dep. at
136:20-137:16.)

          In response to plaintiff's concerns, Lloyd informed
plaintiff that he would need to return to his doctor to determine
whether additional restrictions were needed.  (Id. at 55:24-56:2;
Lloyd Dep. at 103:21-23.)  Lloyd also emailed defendant's third-
party workers' compensation claims representative Jennifer Brown
from ESIS about plaintiff's complaints of pain from "working over
8 hours and extension forward and upwards."  (Whitten Decl. Ex. C
at Ex. 61 (Docket No. 21); Brown Dep. at 10:12-11:18, 19:3-5.)
Although Brown left a message for plaintiff recommending he
return to his physician, she recognized that ESIS's involvement
was limited to plaintiff's workers' compensation claim and that
it was not involved with requests for accommodations under FEHA.
(Brown Dep. at 18:24-19:19, 31:21-32:20.)  Lloyd relaying

1  plaintiff's complaints to ESIS thus did not facilitate

2  discussions about potential accommodations for plaintiff.

3          Plaintiff also testified that he complained to his

4  shift supervisor, Leonard Lara, on one occasion that he could not

5  work overtime because his "arm hurt."  According to plaintiff,

6  Lara "yelled" at him and told him that he had "been cleared" to

7  work.  (Thomsen Dep. at 124:18-24.)  Jose Garcia testified that

8  plaintiff told him on one occasion that he was experiencing

9  shoulder pain in the assistant end gluer position.  (J. Garcia

10 Dep. at 43:24-44:19.)  Jose Garcia claims he told plaintiff to

11 "go back" to his doctor and that he would inform Human Resources

12 of plaintiff's concern.  (Id. at 44:22-24.)  While Jose Garcia

13 verbally informed Human Resources that plaintiff had complained

14 about his shoulder pain, there is no evidence that anyone from

15 Human Resources followed up with plaintiff.  (Id. at 44:25-45:9.)

16          It is undisputed plaintiff never returned to his

17 physician to request additional restrictions after he began

18 working as an assistant end gluer.  (Thomsen Dep. at 55:24-

19 56:10.)  Because plaintiff failed to return to his physician

20 after Lloyd and Jose Garcia requested him to, defendant contends

21 plaintiff's reasonable accommodation and interactive process

22 claims must fail.

23          It is undisputed, however, that plaintiff's physician

24 had already restricted plaintiff from lifting in excess of thirty

25 pounds and plaintiff complained to defendant that his duties as

26 an assistant end gluer occasionally required him to lift in

27 excess of that restriction.  Although defendant contends that

28 plaintiff elected to lift multiple bundles and could have avoided

1    lifting in excess of thirty pounds, plaintiff has put forth

2    evidence from which a jury could find that plaintiff felt

3    compelled to lift multiple bundles.  First, plaintiff testified

4    that the speed of the process required him to move about four

5    bundles at a time, which weighed in excess of thirty pounds when

6    moved together.  (Id. at 52:5-16.)  He also claimed that moving

7    the leftover corrugated cardboard pieces known as dunnage

8    exceeded his restrictions because even though each individual

9    dunnage was under ten pounds, the speed of the process required

10   that he pick up multiple pieces at a time.  (Id. at 53:2-54:3.)

11        Second, plaintiff testified that the machine operator

12   he was assigned to work with, Jose Renteria, was not

13   "accommodating" and allowed the machine to keep running when it

14   was getting backed up and materials were falling.  (Id. at 70:3-

15   23.)  Plaintiff testified he told Supervisor Chris McMillan how

16   Renteria's behavior was risking injury to him and McMillan

17   indicated that he had heard similar complaints about Renteria,

18   but McMillan did not do anything to address plaintiff's concerns.

19   (Id. at 70:3-71:25.)

20        In light of this evidence, a reasonable jury could find

21   that defendant had an obligation to continue to engage in the

22   interactive process to assess whether the assistant end gluer

23   position could be modified to prevent plaintiff from lifting in

24   excess of his restriction.

25        With respect to plaintiff's complaints about overtime

26   hours and the overhead lever, it is undisputed that plaintiff's

27   physician had not restricted plaintiff's ability to operate an

28   overhead lever or work overtime.  (Id. at 58:1-4.)  Relying on

1    *King v. United Parcel Service, Inc.*, 152 Cal. App. 4th 426 (3d

2    Dist. 2007), defendant contends that plaintiff's failure to

3    obtain a physician's note as to these restrictions is fatal to

4    his FEHA accommodation and interactive process claims.

5              In *King*, the employee claimed that the employer failed

6    to reasonably accommodate his blood disorder when it required him

7    to work a later shift.  After returning from a medical leave of

8    absence because of his blood disorder, the plaintiff's physician

9    had cleared him to work "regular hours."  *King*, 152 Cal. App. 4th

10   at 443.  The parties disputed whether the "regular hours" the

11   employee was cleared to work were regular "business hours" or the

12   later hours he had been working prior to going on disability.

13   Id.  In granting the employer's motion for summary judgment on

14   the employee's FEHA claim, the court emphasized that the employee

15   had not "sustained his burden of demonstrating a genuine issue of

16   material fact given his failure to get additional clarification

17   from his doctor to specifically restrict his hours and to

18   communicate his limitations to his supervisors."  Id. at 444.  It

19   concluded that it was "incumbent upon [the employee] to produce

20   clear and unambiguous doctor's orders restricting the hours he

21   could work."  Id.

22             *King* cannot be interrupted as holding that an

23   employee's FEHA claim will necessarily fail in the absence of a

24   physician's note itemizing each restriction.  Prior to finding

25   that the employee had failed to carry his burden, the court in

26   *King* recognized that "the interactive process compelled by FEHA

27   requires flexibility by both the employer and employee, and that

28   no magic words are required to necessitate accommodation."  Id.

13

1    at 444.  It also found the doctor's note necessary in that case

2    because the employee had not "establish[ed] that he communicated

3    his distress to his supervisors or made the kind of specific

4    request for a modified work schedule required to trigger an

5    employer's duty to provide accommodation."  Id.  The employee had

6    also complained about working the later hours prior to his

7    disability and had an "apparent ability" to work them after

8    returning from disability leave.  Id.

9          Unlike in King, defendant knew and plaintiff's

10   physician had confirmed that plaintiff had a permanent shoulder

11   injury and his complaints about the overhead lever and overtime

12   hours related directly to that disability.  Plaintiff also made

13   repeated and specific complaints to defendant about how operating

14   the overhead lever and working overtime were causing him shoulder

15   pain.  Under these facts, a reasonable jury could find that FEHA

16   obligated defendant to do more than simply tell plaintiff to go

17   back to his physician.

18         Allen v. Pacific Bell, 348 F.3d 1113 (9th Cir. 2003),

19   is also distinguishable.  In that case, the employee's physician

20   had restricted the employee to sedentary positions and the

21   employee subsequently requested to be reassigned to his prior,

22   non-sedentary position.  Allen, 348 F.3d at 1115.  Pursuant to

23   its "policy that it would reconsider an employee's disability

24   restrictions if he submitted medical evidence that his health had

25   changed," the employer required the employee to obtain a release

26   from his physician before the employer would reassign him to a

27   non-sedentary position.  Id.  Because the employee failed to

28   obtain this release, the Ninth Circuit concluded the employer had

1   complied with its obligations under FEHA.  Id.  Unlike in Allen,

2   defendant has not cited any internal policy requiring that a

3   physician itemize each possible modification that may stem from a

4   diagnosed and documented disability.  Defendant's adjustment of

5   how plaintiff could operate the overhead lever or whether he

6   worked overtime hours would not have required defendant to take

7   action that was entirely inconsistent with the limitations placed

8   by plaintiff's physician like in Allen.

9        There is also circumstantial evidence from which a

10  reasonable jury could find that defendant could have addressed

11  plaintiff's concerns about the overhead lever.  Plaintiff

12  testified that he asked "Rudy" in maintenance whether the

13  overhead lever could be moved and "Rudy" told him that it was

14  possible to move the lever.  (Thomsen Dep. at 51:14-24.)

15  Defendant suggests that plaintiff could have independently

16  modified how he operated the lever by slightly altering his

17  stance and maneuvering the lever with his right hand instead of

18  his left, (Garcia Decl. ¶ 14 (Docket No. 19-3)), but plaintiff

19  contends that he needed to use his right hand to "tidy[] the

20  product" while operating the lever with his left hand, (Thomsen

21  Dep. at 62:14-63:9).  A reasonable jury could thus find that FEHA

22  obligated defendant to discuss these modifications with plaintiff

23  and find out whether this adjustment was possible for him.

24        As the court in King explained, an employer cannot

25  prevail at summary judgment on a FEHA reasonable accommodation

26  claim unless "it establishes through undisputed facts that . . .

27  the employer did everything in its power to find a reasonable

28  accommodation, but the informal interactive process broke down

15

1  because the employee failed to engage in discussions in good

2  faith."  152 Cal. App. 4th at 442-43.  A reasonable jury could

3  find that plaintiff's repeated complaints obligated defendant to

4  at least engage in a dialogue with plaintiff in response to his

5  concerns about the overhead lever and overtime hours before

6  summarily concluding that he had to return to his doctor.

7        Accordingly, because triable issues of fact exist as to

8  whether defendant continued to engage in the interactive process

9  and reasonably accommodate plaintiff after transferring him to

10  the assistant end gluer position, the court must deny defendant's

11  motion for summary judgment on plaintiff's subsection 12940(m)

12  and (n) FEHA claims.

13        B.   FEHA Subsection 12940(a) Disability Discrimination

14        Subsection 12940(a) of FEHA renders it unlawful for an

15  employer to discharge an employee because of the employee's

16  "medical condition" unless the employee, "because of his or her

17  physical or mental disability, is unable to perform his or her

18  essential duties even with reasonable accommodations."  Cal.

19  Gov't Code § 12940(a)(1).  "California applies the McDonnell

20  Douglas burden-shifting framework and other federal employment

21  law principles when interpreting the FEHA."  Schechner v. KPIX-

22  TV, 686 F.3d 1018, 1023 (9th Cir. 2012).

23        Under this framework, the plaintiff must first

24  establish a prima facie case, which "requires the employee to

25  show he or she (1) suffered from a disability, (2) was otherwise

26  qualified to do his or her job, and (3) was subjected to adverse

27  employment action because of the disability."  Nealy, 234 Cal.

28  App. 4th at 378.  If "the plaintiff establishes a prima facie

case, the burden shifts to the employer to rebut the presumption

by producing admissible evidence, sufficient to raise a genuine

issue of fact . . . that its action was taken for a legitimate,

nondiscriminatory reason." Guz v. Bechtel Nat'l Inc., 24 Cal.

4th 317, 355-56 (2000) (internal quotation marks omitted). "If

the employer sustains this burden, the presumption of

discrimination disappears," and the plaintiff must then show "the

employer's proffered reasons as pretexts for discrimination, or

[] offer any other evidence of discriminatory motive." Id.

Defendant concedes for purposes of this motion that

plaintiff can establish a prima facie case but contends it had a

legitimate, non-discriminatory reason for terminating plaintiff

and that plaintiff cannot establish a triable issue of fact that

its reason was pretextual.

### 1. Legitimate, Non-Discriminatory Reason

Defendant argues it legitimately terminated plaintiff

because plaintiff refused to work overtime at the end of his

shift in violation of its Work Schedule Policy. Under FEHA, "it

does not matter whether plaintiff actually did commit [the

alleged misconduct] as long as [the employer] honestly believed

he did." King, 152 Cal. App. 4th at 433; see also King, 152 Cal.

App. 4th at 436 ("It is the employer's honest belief in the

stated reasons for firing an employee and not the objective truth

or falsity of the underlying facts that is at issue in a

discrimination case.").

Defendant's written Work Schedule Policy states:
In the case of multiple shift operations, employees
shall not leave their stations until relieved by the
oncoming shift, nor before the end of their shift. If

> an employee's relief does not appear, the employee
> must remain at his/her station until relived or given
> permission to leave by the supervisor on duty.

(Pangborn Decl. at 116.)  The Employee Manual explains that an

unscheduled requirement to continue working would constitute

"Incidental Overtime."  (See id. ("Incidental overtime may become

necessary when an illness or emergency keeps co-workers from

being at work as anticipated.").)  As memorialized in the

Employee Manual, an employee is "expected to cooperate" with a

request to work incidental overtime "as a condition of [his or

her] employment."  (Id.)  With incidental overtime, an employee

may "request[] to be released from the overtime, [and] the

company, in its discretion, may attempt to find a replacement for

that position and offer such work as voluntary overtime."  (Id.)

On February 19, 2014, plaintiff had worked his

regularly scheduled night shift as an assistant end gluer, with

Renteria working as the machine operator.  (Thomsen Dep. at 67:5-

8, 68:9-14, 69:1-8.)  Lara was working as the production

supervisor for the shift and, shortly before plaintiff's shift

ended, Lara informed Renteria and plaintiff that both of the

assistant end gluers for the next shift had called in sick and

that either Renteria or plaintiff needed to continue working.

(Id. at 72:11-25.)  Plaintiff contends he told Lara he could not

stay for the next shift because he had two appointments.[3]  Lara

---

[3]  Plaintiff later conceded in his deposition that he did
not have any appointments, but made up that excuse because he did
not want to admit that he was experiencing too much pain to work
overtime.  (Id. at 73:1-75:25.)  While the jury may ultimately
consider plaintiff's dishonesty in assessing his credibility, his
false excuse is not relevant to his FEHA claim because defendant
did not learn that his excuses were false until after this

18

1  testified that after plaintiff indicated he had appointments, he

2  inquired whether Renteria could stay and when Renteria said he

3  could not stay, Lara told plaintiff that he had to stay.  (Lara

4  Dep. at 7:16-23.)

5         After discovering that plaintiff had left, Lara

6  reported to Jose Garcia that plaintiff had left without

7  permission and Jose Garcia and Lara contacted Del Razo.  (Del

8  Razo Dep. at 87:4-25.)  Del Razo and Lloyd began an investigation

9  and plaintiff again indicated he had appointments when they

10 contacted him at home to inquire why he had left.  (Id. at 90:25-

11 91:11.)  Plaintiff was then suspended pending further

12 investigation, which included obtaining written statements from

13 Lara, Garza, and Renteria and verifying when plaintiff had

14 clocked out that day.  (Id. at 88:24-89:13.)  After their

15 investigation, Del Razo and Lloyd concluded that plaintiff had

16 left the facility in violation of Lara's order and the company's

17 policy.

18        Because Del Razo and Lloyd had both worked for

19 defendant for less than a year and had not handled a similar

20 incident before, they talked to Jose Garcia about what would be

21 the appropriate disciplinary action.  (Lloyd Dep. at 22:21-24.)

22 Jose Garcia recalled that defendant had discharged at least one

23 other employee in the past for similar misconduct.  (Id. at

24 22:21-24:11; see also J. Garcia Dep. at 12:19-22 (testifying he

25 believes he gave Lloyd the name of two employees terminated under

26 similar circumstances in the past).)

27

28 litigation commenced.

1    Plaintiff concedes he understood that he was required
2  to continue working unless his replacement relieved him or his
3  supervisor gave him permission to leave.  (Thomsen Dep. at 76:12-
4  16.)  According to plaintiff, he was authorized to leave because
5  Richard Ramirez relieved him and Lara never told him he had to
6  stay.  (Id. at 77:4-17, 79:4-12.)  Ramirez has indicated that he
7  believed he was plaintiff's relief that day and had in fact
8  informed plaintiff that he was his relief prior to plaintiff
9  leaving.[4]  (Ramirez Decl. ¶ 4.)  It is undisputed, however, that
10  Ramirez did not inform defendant that believed he had relieved
11  plaintiff until after plaintiff was terminated.

12    Under these circumstances, defendant has established
13  that it had a legitimate reason for terminating plaintiff after
14  he refused to work incidental overtime and defendant had no
15  reason to know that Ramirez claimed to have relieved plaintiff.

16    2.   Pretext

17    "A plaintiff may establish pretext either directly by
18  persuading the court that a discriminatory reason more likely
19  motivated the employer or indirectly by showing that the
20  employer's proffered explanation is unworthy of credence."  Dep't
21  of Fair Emp't & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 746
22  (9th Cir. 2011) (internal quotation marks and citation omitted).
23  "While [the court] must liberally construe plaintiff's showing
24  and resolve any doubts about the propriety of a summary judgment
25  in plaintiff's favor, plaintiff's evidence remains subject to

26    _____
27    [4]   Genuine disputes exist as to who was identified as
   working on the schedule for February 19, 2014.  Taking all
   inferences in favor of plaintiff, the schedule indicated that
28  Ramirez was relieving plaintiff.  (See Ramirez Decl. ¶ 3.)

1  careful scrutiny." <u>King</u>, 152 Cal. App. 4th at 433.  The

2  "[p]laintiff's evidence must relate to the motivation of the

3  decision makers to prove, by nonspeculative evidence, an actual

4  causal link between prohibited motivation and termination."  <u>Id.</u>

5      Even if defendant had an honest belief that plaintiff

6  left work on February 19, 2014 in violation of its policy,

7  plaintiff contends that his termination for that misconduct was

8  mere pretext because (1) defendant's own policies supported

9  discipline, not termination and (2) defendant's decision was

10  motivated by plaintiff's disability and potential disability

11  leave.

12      While defendant's policy requires an employee to work

13  incidental overtime as outlined above, it does not identify the

14  consequence of an employee's failure to work incidental overtime.

15  At the same time, the Employee Manual has a detailed "no fault"

16  attendance policy.  The attendance policy defines "absences" as

17  "any time missed by an employee when he/she is scheduled for

18  work."  (Pangborn Decl. at 119.)  The attendance policy provides

19  an identified number of points that are assessed under various

20  circumstances and the potential disciplinary actions resulting

21  from incurring points, with a total of nine points amounting to

22  just cause for termination.  (<u>Id.</u> at 120-21.)  The attendance

23  policy provides for the assessment of one point if an employee

24  leaves a shift sixty or more minutes early and for the assessment

25  of two points if an employee fails to call in sick or show up for

26  a scheduled shift.  (<u>Id.</u>)

27      Although Del Razo acknowledges this attendance policy,

28  he believes that the attendance policy did not apply to plaintiff

having "abandoned his shift . . . . without authorization." (Del Razo Dep. at 93:8-94:6.) Del Razo could not explain what "no fault" means under the attendance policy, but testified that abandoning a shift does not come within the attendance policy for leaving early. (Id. at 94:14-95:22.) Anthony Garcia also recognized that the Employee Manual did not indicate that "walking off the job" was a terminable offense, but that it was an "immediate discharge violation" even if it was not a written policy. (A. Garcia Dep. at 40:21-41:6.) While Anthony Garcia expected that employees would be familiar with this unwritten "policy," he testified that he had not previously terminated an employee for "walking off the job," (A. Garcia at 48:2-24), and plaintiff could not recall it happening to another employee, (Thomsen Dep. at 85:24-87:1).

Because the Employee Manual is silent as to the consequence of an employee's refusal to work incidental overtime, but lays out a detailed attendance policy and point system, a reasonable jury could infer that defendant intended for the refusal to work incidental overtime to be treated as an attendance violation. Moreover, if plaintiff had simply failed to show up for his originally scheduled shift--and thus not been present for the alleged demand to work incidental overtime--he would have been assessed only two points under the attendance policy. A reasonable jury could thus infer that defendant knew its termination decision was inconsistent with the attendance policy and defendant simply seized on an opportunity to terminate plaintiff's employment to avoid having to continue to accommodate his disability.

1  Not only could a jury find that termination for

2  plaintiff's alleged misconduct is inconsistent with defendant's

3  attendance policy, triable issues also exist as to whether

4  termination was consistent with defendant's past practices.

5  While Jose Garcia testified he believed two other employees had

6  been terminated for similar misconduct, he also testified that he

7  lacked knowledge of the specific facts leading to the termination

8  of those employees.  (J. Garcia Dep. at 12:14-15:6.)

9  Additionally, although Lloyd recalls checking one prior

10  employee's personnel file, she does not recall confirming any

11  details in the file except the existence of the termination

12  notice.  (Lloyd Dep. at 22:21-24:11.)  Lara also testified that

13  he had contacted Jose Garcia when he discovered plaintiff had

14  left in order to let him know that one of the machines would not

15  be operating, not because he was suggesting that plaintiff should

16  be disciplined.  (Lara Dep. at 25:10-20.)

17  The lack of a clear warning or prior practice of

18  terminating employees who refuse to work incidental overtime is

19  in stark contrast to the employer's unequivocal warning in _King_

20  about termination prior to the employee's misconduct.  In _King_,

21  the employer terminated the employee for violating its integrity

22  policy when the employee had allegedly "encouraged a driver to

23  falsify a timecard to bring it into compliance with federal

24  regulations limiting driving time."  152 Cal. App. 4th at 429.

25  Prior to terminating the employee for this misconduct, the

26  employer had (1) terminated the employee's supervisor for failing

27  to have communicated the driving time regulations to plaintiff;

28  and (2) met with plaintiff on two prior occasions to go over the

23

1   driving time policy and warn him that his job was in jeopardy if

2   he did not monitor and accurately report drivers' hours.  Id. at

3   436-37.  In King, it was "undisputed that plaintiff was well

4   aware of company policy, his responsibility, and the consequences

5   that would ensue if he failed to meet his responsibility."  Id.

6   at 437.  It is far from undisputed in this case that plaintiff--

7   or even defendant for that matter--understood that termination

8   was likely to occur if an employee refused to work incidental

9   overtime.

10          Defendant's knowledge that plaintiff's disability was

11  permanent and could necessitate additional time off work also

12  gives rise to the inference that plaintiff's termination for

13  failing to work incidental overtime was mere pretext.  On January

14  17, 2014, a Panel Qualified Medical Evaluation ("PQME") was

15  performed on plaintiff for purposes of his workers' compensation

16  claim.  (Whitten Decl. Ex. P at 1.)  The PQME indicated that

17  plaintiff is at "maximum medical improvement," his disability is

18  "permanent and stationary," and he may require additional surgery

19  on his shoulder.  (Id. Ex. P at 18-19; see also J. Garcia Dep. at

20  38:24-39:4 (explaining that "maximum medical improvement" means

21  the individual will "never get better than what [he is] currently

22  at").)  This diagnosis was consistent with prior medical

23  examinations in which plaintiff's physician found he required

24  permanent work restrictions and potentially required another

25  surgery.  (Pangborn Decl. at 156.)

26          Although Del Razo does not recall seeing the PQME, he

27  testified that, prior to making the decision to terminate

28  plaintiff, he knew that plaintiff "was at his maximum medical

improvement" and had been found to be "permanent and stationary."
(Del Razo Dep. at 85:22-25.)  Jose Garcia testified he knew at
the time of plaintiff's termination that plaintiff would always
require an accommodation.  (J. Garcia Dep. at 50:4-14.)
Plaintiff has also raised a triable issue of fact that Lloyd was
aware of the results of the recent PQME prior to making the
termination decision.  The notation in the corner of ESIS's copy
of the PQME suggests that ESIS received the PQME on February 21,
2014.  (Whitten Decl. Ex. P at 1.)  On February 20, 2014, Lloyd
had emailed Brown stating, "We have an issue with Jan and I need
to connect with you regarding his status ASAP.  Did we get a full
duty release for him?"  (Id. Ex. C at Ex. 62.)  A jury could
infer that Lloyd asked about whether a "full duty release" was
obtained because she was aware a PQME had recently been
performed.  In response to Lloyd's email, Brown and Lloyd had a
subsequent phone conversation and a reasonable jury could infer
that Brown responded to Lloyd's question about whether a full
release was obtained in that conversation.  (See Lloyd Dep. at
115:10-25.)

         Taking all inferences in favor of plaintiff, a jury
could also infer from Lloyd's February 20, 2014 email to Brown
that the "issue" Lloyd was referring to was plaintiff's conduct
on the prior day.  In the timeline Lara submitted to Lloyd, Del
Razo, and Jose Garcia about the February 19, 2014 incident, he
also began by memorializing plaintiff's shoulder injury and
including the November 2013 permanent lifting restriction.
Lloyd's email and Lara's timeline give rise to the inference that

1   the decision makers were not evaluating the February 19, 2014
2   incident independent of plaintiff's disability.

3        On February 25, 2014, plaintiff also informed Del Razo
4   that he was "going to pursue disability vs. continuing to work"
5   because of his shoulder pain and that "he would seek permanent
6   disability whether he has a job or not." (Pangborn Decl. at
7   357.) Del Razo relayed this information to Lloyd and Anthony
8   Garcia via email. (Id.) It is undisputed that defendant
9   provided a salary continuation plan that would have provided for
10  plaintiff to take six months of short-term disability leave and
11  that defendant would have continued to pay him during that leave.
12  (McDonald Dep. at 18:5-19:1; see also Lloyd Dep. at 81:11-22
13  (testifying that she was aware of the salary continuation plan
14  and that defendant paid that benefit).)

15       According to defendant, plaintiff's intent to take
16  additional disability was unknown at the time the termination
17  decision was made because the decision was made on February 24,
18  2014. (Lloyd Dep. at 12:3-16.) However, Del Razo's February 25,
19  2014 email recounts how plaintiff was apologetic for his conduct
20  on February 19, 2014 and had attempted to explain his actions.
21  (Id.) Based on Del Razo's inclusion of plaintiff's apologies and
22  explanations in the email, a jury could infer that Del Razo
23  thought this information was relevant to a termination decision
24  that had not yet been made or finalized. Defendant also did not
25  draft the termination notice until February 28, 2014, (Del Razo
26  Dep. at 104:8-17), which is four days after when Lloyd contends
27  the decision had been made. Plaintiff has thus established a
28  genuine dispute as to when defendant made the decision to

26

1   terminate him and whether it knew plaintiff was planning to take

2   additional paid disability leave at the time it made the

3   decision.

4           When considering all of this evidence, a jury could

5   find that plaintiff's disability motivated defendant's decision

6   to terminate him and that his termination for having refused to

7   work incidental overtime was mere pretext.  Accordingly, the

8   court must deny defendant's motion for summary judgment on

9   plaintiff's subsection 12940(a) FEHA claim.

10          C.   Wrongful Termination in Violation of Public Policy

11          Defendant concedes that plaintiff's wrongful

12  termination of public policy claim rises and falls with his FEHA

13  claims.  (Def.'s Mem. at 24:6-13.)  Accordingly, because

14  plaintiff has established triable issues of fact on his FEHA

15  claims, the court must also deny defendant's motion for summary

16  judgment on his wrongful termination in violation of public

17  policy claim.

18          D.   Defamation Claim

19          Under California law, "[t]he elements of a defamation

20  claim are (1) a publication that is (2) false, (3) defamatory,

21  (4) unprivileged, and (5) has a natural tendency to injure or

22  causes special damage."  Wong v. Tai Jing, 189 Cal. App. 4th

23  1354, 1369 (6th Dist. 2010) (citing Taus v. Loftus, 40 Cal. 4th

24  683, 720 (2007)).  Plaintiff bases his defamation claim on the

25  alleged false statements Jose Garcia and Lara made to Lloyd and

26  Del Razo about (1) plaintiff leaving without his relief being

27  present; (2) plaintiff using profanity when he left; (3) one of

28  the machines being unable to run because plaintiff left; and (4)

1   that plaintiff deserved to be terminated because of his conduct.[5]

2   (Pl.'s Opp'n at 18:16-19:5.)  Even assuming plaintiff could

3   establish a triable issue as to the falsity of these statements

4   and that they were published, defendant contends the statements

5   were nonetheless privileged under California Civil Code

6   subsection 47(c).

7          Subsection 47(c) provides that a communication is

8   privileged if it is made "without malice, to a person interested

9   therein, (1) by one who is also interested, or (2) by one who

10  stands in such a relation to the person interested as to afford a

11  reasonable ground for supposing the motive for the communication

12  to be innocent, or (3) who is requested by the person interested

13  to give the information."  Cal. Civ. Code § 47.  Plaintiff does

14  not, and cannot, dispute that Jose Garcia and Lara had a common

15  interest as supervisors in communicating information to

16  management that was relevant to the alleged misconduct and

17  potential discipline of one of defendant's employees.  Cf. King,

18  152 Cal. App. 4th at 440 ("[B]ecause an employer and its

19  employees have a common interest in protecting the workplace from

20  abuse, an employer's statements to employees regarding the

21          [5]    At oral argument, plaintiff's counsel indicated that
22  plaintiff's defamation claim is also based on the failure of
    certain managers within the company to investigate the alleged
23  false information reported to them.  Plaintiff's counsel could
    not articulate how a mere listener to an alleged defamatory
24  statement could ever be liable for defamation.  The only case
    counsel cited at oral argument was Rollenhagen v. City of Orange,
25  116 Cal. App. 3d 414 (4th Dist. 1981).  That case addressed a
    broadcaster's failure to investigate prior to making a defamatory
26  statement, not any duty on behalf of a person who hears a
    defamatory statement to investigate whether the statement is true
27  before making a decision based on that statement.  See
    Rollenhagen, 116 Cal. App. 3d at 423.
28

1 reasons for termination of another employee generally are

2 privileged."). Plaintiff argues only that the communications are

3 not privileged because a reasonable jury could find that they

4 were made with malice.

5         "Insofar as the common-interest privilege is concerned,

6 malice is not inferred from the communication itself." Noel v.

7 River Hills Wilsons, Inc., 113 Cal. App. 4th 1363, 1370 (4th

8 Dist. 2003). "The malice necessary to defeat a qualified

9 privilege is actual malice which is established by a showing that

10 the publication was motivated by hatred or ill will towards the

11 plaintiff or by a showing that the defendant lacked reasonable

12 grounds for belief in the truth of the publication and therefore

13 acted in reckless disregard of the plaintiff's rights." Id.

14 (quoting Sanborn v. Chronicle Publ'g Co., 18 Cal. 3d 406, 413

15 (1976)) (internal quotation marks omitted). "[M]alice focuses

16 upon the defendant's state of mind, not his [or her] conduct.

17 Mere negligence in inquiry cannot constitute lack of reasonable

18 or probable cause." Id. (internal quotations marks and citation

19 omitted) (alterations in original).

20         Plaintiff has not put forth any evidence even giving

21 rise to the inference that Jose Garcia and Lara were motivated by

22 hatred or ill will when they made the statements underlying his

23 defamation claim. Plaintiff nonetheless contends a jury could

24 find that they made the statements with malice because they

25 failed to thoroughly investigate the incident and thus lacked

26 reasonable grounds to believe that the statements were true. The

27 strongest evidence that plaintiff believed he was authorized to

28 leave is Ramirez's statements that he told plaintiff he was there

1  to relieve him.  (See Ramirez Decl. ¶ 4.)  Ramirez, however, did

2  not share this information with defendant until after this

3  litigation commenced.

4        While defendant could have interviewed Ramirez when it

5  interviewed other employees, plaintiff's own dishonesty made such

6  an interview irrelevant.  It is undisputed that Del Razo and

7  Lloyd called plaintiff the day of the incident to inquire why he

8  had not stayed on to work the incidental overtime.[6]  (Del Razo

9  Dep. at 87:4-25.)  In response, plaintiff told them that he left

10 because he had appointments he could not miss.  (Id. at 90:25-

11 91:11.)  Plaintiff never told defendant or even suggested during

12 that interview that he believed he was allowed to leave because

13 Ramirez had told him that he was there to relieve him.  Instead,

14 he repeated the same excuse that he has since admitted was false.

15 (Thomsen Dep. at 73:1-75:25.)  A reasonable jury could not infer

16 that defendant acted negligently--let alone with malice--in

17 failing to interview Ramirez because plaintiff's own lie made

18 that interview entirely irrelevant.

19

20        [6]   Any suggestion that Jose Garcia or Lara should have
   interviewed plaintiff or others prior to even reporting the
21 alleged misconduct to Lloyd and Del Razo ignores the division of
   responsibility in a company as large as defendant.  Additionally,
22 while plaintiff contends defendant could have learned that
   Ramirez was relieving him by checking the schedule as plaintiff
23 contends it existed that day, failure to check the schedule in
   light of plaintiff's representations as to why he left was
24 negligent at most.  See Noel, 113 Cal. App. 4th at 1371 ("[M]ere
   negligence . . . in the sense of oversight or unintentional
25 error, is not alone enough to constitute malice.  It is only when
   the negligence amounts to a reckless or wanton disregard for the
26 truth, so as to reasonably imply a wilful disregard for or
   avoidance of accuracy, that malice is shown." (internal quotation
27 marks and citation omitted) (omission in original)).

28

1       Accordingly, because a reasonable jury could not find

2 that any of defendant's employees made the communications at

3 issue with malice, the communications are privileged under

4 subsection 47(c) and the court must grant defendant's motion for

5 summary judgment on plaintiff's defamation claim.

6       IT IS THEREFORE ORDERED that defendant's motion for

7 summary judgment be, and the same hereby is, DENIED with respect

8 to plaintiff's FEHA subsections 12940(a), (m), and (n) claims and

9 wrongful termination in violation of public policy claim; and

10 GRANTED with respect to plaintiff's defamation claim.

11 Dated:  June 2, 2016

12       WILLIAM B. SHUBB

13       UNITED STATES DISTRICT JUDGE

31